Filed 7/11/23  Alexis S. v. Superior Court CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ALEXIS S., <br><br>    Petitioner, <br><br>    v. <br><br> THE SUPERIOR COURT OF LOS ANGELES COUNTY, <br><br>    Respondent; <br><br> LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br>    Real Party in Interest. | B325906 <br><br> Los Angeles County <br> Super. Ct. No. 21CCJP05523A |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Lisa A. Brackelmanns, Juvenile Court Referee.  Petition denied.

Children's Law Center and Michael Ono for Petitioner.

No appearance for Respondent.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Real Party in Interest.

Children's Law Center, Kristin Hallak and Christopher Kim for Petitioner

Alexis S. (Mother) petitions for extraordinary relief from juvenile court orders terminating reunification services and setting a permanency planning hearing for her one-year-old daughter, Ellie G. We deny the petition on its merits.

**FACTUAL AND PROCEDURAL BACKGROUND**

I. *Mother's Juvenile Court History*

Mother, born in 2000, became a dependent child of the court at age 10 due to her parents' domestic violence and drug abuse. Mother was placed with the maternal great-grandmother, and her cousin Y.L. later became her foster parent.

Mother and Antonio H. had two children while Mother was still a minor: Au.H., born in 2017, and Ay.H., born in 2018. Au.H. and Ay.H., were found to be subject to juvenile court jurisdiction in 2018 due to sustained allegations of domestic violence between their parents, the parents' substance abuse, and their father's mental and emotional problems. Mother did not reunify with the children. Mother contended DCFS underreported her visitation with Au.H. and Ay.H., and she alleged the children's caregiver prevented her from visiting them. Mother attributed her inability to reunify with her children to depression and trauma. Mother's parental rights to Au.H. and Ay.H. were terminated October 19, 2021.

In November 2020, Mother and Jose G. (Father) had a daughter, Gracie G. According to Mother, Father was angry, controlling, and engaged in ongoing, extensive domestic violence. The violence began early in the relationship with pushing and shoving, paused while Mother was pregnant, and escalated once Gracie G. was born. Father once dragged Mother and Gracie G. into a car and punched Mother in the face with a closed fist,

2

causing her to bleed.  Mother remained in her relationship with Father.

Gracie G. was detained from both parents in 2021 due to Father's domestic violence and Mother's mental health issues. Gracie G. was placed with Y.L. in May 2021, and over the following 10 months, Mother visited her twice and telephoned her twice.  Father never visited.  As of May 2021, Mother was not enrolled in any services.

In November 2021, the court found true under Welfare and Institutions Code[1] section 300, subdivisions (a) and (b)(1) that Mother and Father had a history of violent altercations, including an incident in which Father dragged Mother into a car, hit her in the face with a closed fist, and grabbed Gracie G. from her arms; on prior occasions, Mother and Father had pushed each other; and Mother's older two children were presently receiving permanent placement services due to violent altercations between Mother and Antonio H.  Under section 300, subdivisions (b)(1) and (j), the court found true that Mother had a history of substance abuse rendering her incapable of providing regular care and supervision for Gracie G. and leading to the dependency proceedings and permanent placement services for Au.H. and Ay.H.  Finally, under section 300, subdivision (b)(3), the court found true that Mother had a history of mental and emotional problems, including depression, such that she could not provide regular care and supervision to Gracie G., and she had failed to regularly participate in treatment and take her prescribed psychotropic medication.

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

3

Mother was ordered to complete a drug and alcohol program with aftercare, a domestic violence support group, weekly drug testing, parenting education, and individual counseling.  Father was ordered to participate in drug testing upon suspicion of substance use, a 52-week domestic violence program, anger management, parenting education, and individual counseling.  Neither parent complied with the court-ordered case plans.

The parents were granted separate monitored visitation.  Neither parent visited Gracie G. or inquired into her well-being.  Instead they created obstacles to receiving services, such as opposing the DCFS staff monitoring visits.

## II. *Ellie G.'s Birth and Disappearance*

Ellie G. was born in late October 2021.  Mother and Father concealed the pregnancy.  Mother told a relative she was not pregnant and attributed her weight gain to abstention from drugs.  (According to the relative, Mother had also denied previous pregnancies.)  She denied being pregnant to her therapist.  DCFS learned of Ellie G.'s birth from an anonymous relative.  The relative heard about the baby from the maternal grandfather and had seen her photograph, but the maternal grandfather later claimed the baby had died, did not exist, or was someone else's.

Mother and Father discontinued their programs near the time of Ellie G.'s birth and dropped out of touch with DCFS.  Mother stopped visiting Gracie G. in August 2021 and began to avoid the social worker assigned to her case.  The social worker on Gracie G.'s case last spoke with the parents a few weeks before Ellie G.'s birth, after which time she did not hear from Father and Mother did not respond to messages.  Father

4

attended his first parenting session on October 24, 2021, but he did not mention his newborn baby; he failed to appear for his next three sessions and did not respond to calls from the service provider. Mother tested negative for drugs three times in October 2021, but then failed to appear for tests in November 2021. She stopped attending therapy sessions after October 28, 2021, and her therapist was unable to reach her.

DCFS spent months searching for Ellie G. and her parents, unable to reach them by telephone or email. Y.L. did not know where the parents were. A social worker attempted to contact the family at the address Father had provided, a reported paternal family home, but the person with whom she spoke denied Mother or Father lived there and did not know of a baby named Ellie. However, a neighbor confirmed the family lived there. Eventually, DCFS spoke with Francisco, Father's brother, who rented a room at the house. Francisco said Father occasionally stayed with him, but he had not seen Father in two weeks. He had met Mother once or twice but did not know much about her, and he denied knowledge of a new baby or how to reach Father. The social worker gave Francisco a business card and asked him to give it to Father as soon as possible. Francisco replied, "I'll call him to give him the message, I mean I'll give it to him when I see him."

DCFS learned Mother was receiving benefits for Ellie G. Her address on file was the Department of Public Social Services (DPSS) office because she claimed homeless assistance.

III. *Petition and Detention*

On December 3, 2021, DCFS filed a dependency petition alleging that Ellie G. came within the jurisdiction of the juvenile court under section 300, subdivisions (a), (b)(1), and (j) because

5

Mother and Father had a history of violent altercations. Specifically, Father had dragged Mother into a vehicle, punched her, and given her a bloody nose; he held Mother hostage; and he grabbed Gracie G. from Mother's arms. DCFS alleged domestic violence between Mother and the fathers of her children had led to Gracie G. becoming a dependent child and Au.H. and Ay.H. receiving permanent placement services. DCFS alleged the violence placed Ellie G. at risk of serious physical harm, damage, and danger. Additionally, DCFS alleged under section 300, subdivisions (b)(1) and (j) that Mother's history of substance abuse and mental and emotional problems endangered Ellie G. and placed her at risk of serious physical harm, damage, and danger.

Ellie G.'s whereabouts were unknown when the petition was filed, but she was believed to be with Father and Mother. In December 2021, the court ordered that Ellie G. be detained, issued arrest warrants for the parents, and ordered a protective custody warrant for Ellie G.

In January 2022, DPSS confirmed Mother and Father were receiving benefits for themselves and Ellie G., using the DPSS office as their address. Mother and Father told DPSS they were staying in a shelter but they did not know its name.

In February 2022, DCFS learned Mother, Father, and Ellie G. were receiving services from a homeless services agency. The agency summoned the family for a February 4, 2022, meeting, where DCFS social workers were waiting for them. Mother and Father denied knowing about the court proceedings involving Ellie G. and refused to give her to DCFS. Law enforcement assistance was needed to take Ellie G. into custody. She was placed with her sister Gracie G. in Y.L.'s home.

## IV.    *Investigation*

A DCFS social worker contacted Mother and Father on February 8, 2022, asking them to let her know by 4 p.m. if they could meet the following day.  The parents did not respond, but the next day they asked for a same-day meeting at 2:30 p.m.  DCFS considered this behavior an example of the parents' attempts to manufacture situations in which they could claim DCFS failed to work with them.

When DCFS met with the parents on February 9, 2022, Father attempted to control Mother and the conversation, interrupting her whenever she spoke.  When asked for Ellie G.'s immunization record, Mother said she would send the record to the social worker, but Father announced that it was DCFS's responsibility to find Ellie G.'s records.  Mother disclosed the name of the clinic where Ellie G. received her immunizations only after Father directed her to do so.

Mother asked about reunification with Ellie G., but Father interrupted, telling Mother they were not there to discuss that topic.  The social worker raised the allegations of the petition and the parents' lack of compliance with previous case plans.  Father said, "Well I think we are all good here.  Let's go."  "Let her [the social worker] do her job and give us the paperwork."

The social worker asked Mother if she had questions.  Appearing timid and with a flat affect, Mother said no.  Father told Mother to ask her question, and Mother wanted to know why DCFS detained Ellie G. when she was well cared for.  Father interrupted, saying, "You know it's because of our history."

The social worker explained the importance of communicating with DCFS and noted Mother and Father had concealed Mother's pregnancy and avoided DCFS.  She

7

emphasized the importance of bonding with a child in order to reunify and noted the parents had not been consistent in Gracie G.'s life. Father said, "Well you have to understand this is my second daughter. I don't know if you've ever lost a wallet, but this hurts a thousand times more than losing a wallet."

The social worker requested statements from the parents about the allegations and their social history, but Father said they would not provide information to DCFS. At Father's instruction, Mother refused to sign consent forms for services for Ellie G. Father ended the meeting.

On February 9, 2022, Y.L. told DCFS Mother had disclosed that Father beat her up, and Father had admitted it. Y.L. described Mother as "a troubled girl who doesn't want help," and said she was "very easily influenced" by Father.

In the jurisdictional/dispositional hearing report filed February 10, 2022, DCFS advised the court Mother and Father had not contacted DCFS to visit Ellie G. DCFS stated it was concerned that Mother and Father refused to allow DCFS to monitor visits and demanded to choose their own monitors. The parents' preferred monitors were unsuitable: paternal uncle Francisco G. had misled DCFS by denying knowledge of Ellie G., and the maternal great grandmother had told DCFS she believed the children should be with their parents and was unable to provide her own address to DCFS.

On February 9, 2022, staff at the shelter where the family had been living told DCFS that even before Ellie G. was detained they had been planning to terminate the family from the program because they had violated shelter policies. The parents had changed the locks to their room so the staff could not perform room checks, and they used a communal restroom for personal

8

storage.  They discarded the shelter's furniture, put their own furniture in the home, and caused a great deal of property damage.

When Ellie G. was removed from the parents' care, they no longer qualified to stay in a family shelter.  Father falsely told the shelter DCFS was doing a home inspection at the shelter that weekend and would return Ellie G. to the parents if their housing was appropriate.  The shelter had planned to arrange alternative housing for Mother and Father, but they lost their spot when they failed to appear for their appointment.  They then refused to move out of the shelter, claiming they had tenants' rights and would obtain legal assistance.  Father was "increasingly aggressive" and assaulted a staff member during the attempt to have the parents removed from the shelter.  Mother appeared sweet and cooperative but changed her stance when Father interrupted and disagreed with her.

On the night of February 9, 2022, Mother and Father broke into their former bedroom at the shelter with two men, frightening other residents.  The residents reported Mother and Father had been dealing drugs from their home, and it was believed they broke in to retrieve drugs.  Father and Francisco G. called the police, claiming they were being unlawfully removed from the home.  It appeared to the shelter that Father was making calculated claims about being kicked out of the home, and Mother appeared to side with Father.  Mother was observed to have a fresh black eye.

The shelter staff explained to the police that Mother and Father were ineligible for housing once Ellie G. was removed from their custody.  With law enforcement help, the parents

agreed to leave the shelter, and they reported they would stay with family members.

DCFS sent Mother and Father a text message on February 10, 2022, asking where they were living. Neither parent responded.

Mother and Father continued to want to visit together despite being told it was not permitted. Mother was 20 minutes late to her two-hour visit on February 14, 2022. Ellie G. initially cried, and Mother fed her in the car seat by propping a bottle. On February 18, Mother visited Ellie G. for one hour and Father visited her the other hour; however, Father wanted to cut his visit short because he was overwhelmed. With assistance from a human services aide (HSA) Father completed his one-hour visit. Mother was present and assisted Father in putting Ellie G. and Gracie G. in the car.

Both parents visited Ellie G. on February 28, 2022. During their separate visits, both claimed Ellie G. was being overfed.

At the arraignment on March 1, 2022, the court granted the parents monitored, separate visitation. The court set the adjudication hearing for March 22, 2022, and ordered DCFS "to interview the parents and include the results of the interview in the report." Also at the arraignment, DCFS asked both parents for information about their participation in programs, but they did not provide any information.

On March 7, 2022, Mother visited for two hours but Father did not show up. Father refused to respond to messages about visitation and appeared for visits when he felt like it. DCFS sent Mother a text message on March 9, 2022, asking for updates on her program progress. Mother said she would provide confirmation from Single Parents of Power, but she did not do so.

DCFS held a family engagement meeting on March 10, 2022. Father did not respond to the meeting invitation. Mother participated; she "presented herself as the victim and indicated that DCFS has never assisted her. Mother indicated she had been doing 'everything' and that she had been testing regularly." (Mother had tested negative for drugs three times, on February 18 and 24, 2022, and March 9, 2022, and was a no show for a March 4 test. She claimed she arrived too late that day to test, but she never submitted a verification of her late arrival for the testing agency.)

Mother skipped her visit on March 11, 2022. She confirmed her March 14, 2022 visit with the HSA, but when she was late to the visit she falsely attributed her late arrival to a lack of confirmation of the visit.

On March 15, 2022 Mother texted two different DCFS employees that she had been unable to make it to the drug testing facility in time to test, requesting that a make-up test be scheduled for the following day. One responded that a make-up test would not be scheduled, and the other indicated that a make-up drug test would have to be approved by a supervisor. Mother did not respond to either message.

DCFS reported on March 16, 2022, that the parents continued to refuse to communicate with DCFS to allow assessment of their case plan compliance. As neither parent had visited Gracie G. nor complied with the case plan in Gracie G.'s case, DCFS considered the prospect of parental reunification with Gracie G. to be "grim."

DCFS concluded the parents "remain in a relationship which does not appear to be healthy. In the thirty to forty minutes spent with them [on February 9, 2022, the social worker]

11

observed Father to be extremely controlling and would not allow Mother to speak. The same behavior has been observed by [another social worker] as well as [shelter] employees. The parents continue to blame DCFS for their current situation. [¶] The parents have misled the [shelter] program by informing them that DCFS was going to return the child to them after a home inspection. In addition, the occupants of the family shelter have reported that the parents were selling drugs from the home. The parents were not forthcoming with [DCFS] on 2/9/22 and refused to be interviewed. They also refused to sign documentation needed to provide the child with services. In addition, they destroyed the shelter's property and furniture, changed locks and did not obey house rules. The parents have continued to be defiant, but then go on to claim that they are the victims. The parents' answers and behavior appears to be calculated. Father has mentioned several times he is going to retain an attorney and has declined visitation when DCFS does not approve a monitor of his choice. It does not appear that the parents are willing to cooperate with DCFS and it does not appear that they have their child's best interest at heart."

On March 22, 2022, the court found true as to both parents the allegations under section 300, subdivisions (b)(1) and (j) and declared Ellie G. a dependent child.

V. ***Continuances***

The court set the disposition hearing for April 26, 2022, five weeks away. It ordered DCFS to assess the maternal great-grandmother as a monitor for Mother's visits, help Father find an appropriate monitor for his visits or provide him visits with an HSA, and submit a supplemental disposition report.

During those five weeks, DCFS advised the court that Mother's proposed monitor, the maternal great-grandmother, had an extensive DCFS history, including a substantiated allegation of caretaker incapacity and her relinquishment of guardianship over Mother and Mother's siblings. Moreover, when interviewed, the maternal great-grandmother did not understand why Ellie G. had been detained; she denied Mother had mental health or substance abuse issues and pronounced Father "a good person."

Father had not contacted DCFS. Mother had visited Ellie G. only once since the adjudication hearing. Mother had one negative drug test.

Mother visited Ellie G. on April 18, 2022 and interacted well with her, changing her diaper, treating her diaper rash, and feeding her. Mother also visited Ellie G. and Gracie G. on April 22, 2022.

Mother tested negative for drugs twice and she submitted a letter indicating her enrollment in domestic violence and parenting education, and substance abuse programs at Single Parents of Power Counseling Agency.

On April 26, 2022, at Mother's request, the court granted another six-week continuance of the disposition hearing to June 8, 2022, and ordered DCFS to verify her visitation and participation in programs.

In the next six weeks, DCFS informed the court it had been unable to verify Mother's participation in programs with the service provider. Sometimes the agency's voicemail was full, and when the social worker left messages or sent email, the agency did not respond. A second social worker had also tried and failed to reach Mother's counselor.

DCFS asked Mother for documentation of her program participation. Mother said her classes had "been combined" with prior classes she had taken and she had completed "almost 30" sessions, with "about 15" left to go before she received her certificate. Mother told DCFS her therapist was preparing a progress letter which Mother would send to DCFS that week. The social worker requested the therapist's name and contact information, explaining it was necessary to speak with her because DCFS did not usually accept combined classes. Mother did not respond. DCFS was concerned about the absence of reports and the inability to discuss Mother's case plan progress with the service provider.

Mother visited Ellie G. four times in May 2022 and twice in June. Mother was appropriate with Ellie G. and attentive to her needs. DCFS was concerned that although Mother had previously stated she was no longer in a relationship with Father, he had continued to visit immediately after Mother and brought food for her and the children during a visit.

Father visited Ellie G. on May 9, 2022, and ended the visit 20 minutes early. When he arrived for his visit on May 11, 2022, and found Ellie G. crying, he became frustrated and angrily left.

Father did not respond to DCFS's inquiry about program participation. Additionally, neither parent had signed referral documents to allow Ellie G. to be evaluated by the Regional Center.

DCFS advised the court it had received a letter from Single Parents of Power on June 2, 2022. The letter stated Mother had enrolled on March 31, 2022, for domestic violence for victims, parenting, and substance abuse counseling, and she was required to attend weekly sessions. Mother began working with a

14

marriage and family therapist trainee, Elizabeth Garcia, on May 9, 2022, and she had completed 10 of 26 sessions in each of her three programs.

Two social workers had repeatedly tried to speak with Garcia but had been unable to reach her. DCFS expressed concern that it could not "discuss the case with the program nor provide vital documents/concerns regarding the extensive history mother has with DCFS." Moreover, DCFS could not "assess the knowledge that [M]other has gained in the program as she continues to be guarded with DCFS."

Father refused to communicate with DCFS, so DCFS lacked information about his compliance with his case plan. Father had not visited Ellie G. consistently.

DCFS finally spoke to Mother's therapist Elizabeth Garcia before the disposition hearing. Garcia said Mother was engaged in her therapy; however, Garcia did not know why Mother had an open DCFS case. The social worker told Garcia she would send her relevant reports.

DCFS remained concerned about "the appropriateness of the program as [M]other began attending in August and then re-enrolled on 3/31/22. Dates of [M]other's attendance have not been provided. DCFS has not been able to discuss concerns and treatment with the program. DCFS has not been able to discuss progress made with [M]other and her ability to implement what she's learned in her programs."

On June 8, 2022, the court once again continued the disposition hearing for three weeks to June 27, 2022, this time at the request of DCFS so that it could assess Gracie G's review hearing set for June 15, 2022. Father's counsel requested that DCFS assess Father's siblings as potential monitors. The court

15

instructed Father's counsel to submit the siblings' names to DCFS and ordered DCFS to assess them as possible monitors. As ordered, DCFS requested contact information for paternal relatives so they could be assessed as monitors, but Father did not respond.

DCFS also reported it had continued to try to contact Mother's therapist Garcia. The social workers sent reports to Single Parents of Power and attempted to speak with Garcia about Mother's progress, but as of June 17, 2022, they had been unable to reach her.

Mother visited Ellie G. on June 16, 2022.

On June 22, 2022, DCFS informed the court that Father's reunification services with Ellie G.'s sibling Gracie G. had been terminated on June 15, 2022. In light of this order, DCFS recommended Father be denied reunification services with Ellie G.

Father submitted a letter stating he had enrolled in a program for domestic violence offenders, parenting education, and co-parenting class on June 6, 2022. On June 21, 2022, Dan Zhu at Single Parents of Power sent an email to DCFS stating she had begun providing co-parenting sessions to both parents. However, when DCFS spoke with Zhu, she revealed she had not met Mother. Zhu had only met with Father, who neither told her why Ellie G. was detained nor disclosed that his reunification services had been terminated with Gracie G.

VI. *Disposition Hearing*

The court held the disposition hearing on June 27, 2022. Mother submitted a June 26, 2022 letter from her therapist Garcia that Mother had completed 15 of 26 domestic violence sessions, 13 of 26 parenting sessions, and 13 of 26 substance

16

abuse sessions. In domestic violence sessions, Mother was "working on self-esteem and boundaries." In parenting, she was working on "emotional intelligence and mindfulness." In substance abuse session, Mother was working on "maintaining sobriety and increasing positivity." Garcia described Mother as "engaged, friendly, cooperative, positive, motivated, and open" during sessions.

The court granted both parents reunification services. Mother was ordered to undergo a full drug/alcohol program with aftercare and weekly random and on-demand testing, a domestic violence victims support group, parenting education, and individual counseling to address case issues. Father was ordered to undergo a 52-week domestic violence program, drug testing upon reasonable suspicion of substance use, parenting education, and individual counseling. Each parent was granted monitored, separate visitation of nine hours per week.

## VII. *Reunification Services Period*

### A. *Mother*

#### 1. Domestic Violence

According to Garcia's progress letter, provided to DCFS by Mother, as of July 26, 2022, she had completed 26 of her 26 domestic violence sessions. As before, in these sessions Mother was "working on self-esteem and boundaries." The letter contained no information about any substantive progress or insight made by Mother through the program. As to all three of her programs, Garcia wrote Mother was "engaged, friendly, cooperative, positive, motivated, takes accountability and is open to discussing case issues during sessions." Mother submitted a

17

certificate of completion of the 26-week program dated July 22, 2022.

### 2. Drug and Alcohol Program with Aftercare

According to Garcia, Mother had completed 16 of 26 substance abuse sessions, and she was still working on "maintaining sobriety and increasing positivity." Over the 16 days between July 26 and August 11, 2022, Mother apparently completed an additional 10 sessions of substance abuse programming, and she submitted a certificate of completion of the substance abuse program dated August 11, 2022. DCFS made multiple attempts to speak to Garcia to confirm Mother's completion of the program but was unable to reach her. DCFS later learned Garcia had left the agency.

Mother tested negative for drugs May 2, 10, 20, and 26, 2002; she failed to test on May 27, 2022. She had four negative tests in June 2022. She missed one test and tested negative four times in July 2022, then missed two tests and tested negative twice in August 2022. In September 2022, Mother missed a test, was unable to provide a sample on one occasion, and tested negative three times. She had four negative tests and one excused absence in October 2022, and two negative tests in November 2022.

### 3. Parenting Education

Mother's May 2022 progress letter said she had completed 10 of 26 parenting class sessions. Her June 2022 progress letter said she had completed 13 of her 26 parenting sessions. The progress letter dated July 26, 2022, stated she had completed nine of her 26 parenting sessions. No explanation was provided for the discrepancies.

18

DCFS received an October 12, 2022 letter from Zhu stating that she began working with Mother on September 8, 2022. According to Zhu, Mother had completed "the last of her [seven] parenting sessions" with Zhu and "showed an understanding of the materials through answering questions and participating in discussion." The letter did not describe any progress made by Mother over the course.

Mother submitted a certificate of completion of the parenting program dated September 28, 2022.

### 4. Individual Therapy

On October 13, 2022, DCFS spoke with Zhu, who was unable to give DCFS feedback on Mother's progress because they had only had one therapy session. Zhu told DCFS Mother had only undergone one therapy session with her prior therapist, Garcia.

As of November 4, 2022, Mother had completed six 1-hour sessions of individual therapy. Zhu's progress letter stated that Mother "has begun addressing underlying issues that have contributed to DCFS intervention and appears to be motivated for change."

DCFS spoke with Zhu on November 17, 2022. Zhu asked for an update on Mother's case and reported Mother was discouraged that her visits were not being liberalized and her daughters were not being returned to her care. When DCFS explained its concerns, Zhu stated that Mother had not reported a lot of that information. Zhu said she understood DCFS's concerns and would raise them with Mother during therapy.

As of December 12, 2022, Mother had completed 10 sessions of individual therapy. Much as before, Zhu wrote that Mother "has been addressing underlying issues that have

contributed to DCFS intervention and appears to be motivated for change."

### 5. Visitation

Mother had a written schedule for monitored visitation with Ellie G. three days per week. She was inconsistent with visits, cancelled visits at least once per week, and often arrived significantly late.

Mother canceled visits with the children on July 15, 2022, August 1, 2022, and August 4, 2022. The children were unavailable for a visit on August 15, 2022, so the social worker offered to reschedule for August 17, 2022; Mother never responded. Mother canceled visits on August 22 and 23, 2022, and said she was unavailable for the following 10 days due to illness. At Mother's request, a virtual visit was scheduled for September 1, 2022, but Mother did not answer when the caregiver called. When the social worker contacted Mother, Mother said she was indisposed but would call back; she never returned the call.

Mother canceled visits on September 8, 9, 23, 29, and 30, 2022, as well as visits scheduled for October 5, 6, and 17, 2022. Mother was supposed to visit with Ellie G. at her doctor's appointment on October 24, 2022, but she did not attend the appointment. Mother canceled a make-up visit scheduled for October 28, 2022. She requested and confirmed a Halloween visit to trick or treat with the children, but then did not appear. Mother also canceled visits on November 4, 10, and 14, 2022.

Y.L. offered to monitor additional visits with Mother and made herself and the children available for virtual visits, but Mother also canceled make-up visits. Mother claimed in October 2022 that she was missing visits due to her new job. Although

DCFS told Mother Y.L. was available to monitor visits and that a new HSA could be requested to match Mother's availability, Mother asked to keep the visitation schedule unchanged. On November 8, 2022, Mother asked for her visits to move to afternoons, but on November 16, 2022, Mother said she did not want the schedule changed after all.

Mother behaved appropriately during visits and engaged with Ellie G. and Gracie G. Mother's visits had not been liberalized because Mother would not provide her address to DCFS, she was a flight risk due to her prior history, and she denied having contact with Father. They shared the same addresses on file.

In Gracie G.'s case, the court ordered DCFS on October 14, 2022, to assess a maternal cousin, Toni C., for unmonitored visits. Toni C. told DCFS she had a close relationship with Mother but had no idea why Mother had an open dependency case. DCFS was concerned about Toni C. serving as a monitor due to the lack of transparency between Mother and Toni C. about the dependency case despite their ostensibly close relationship.

The court in Gracie G.'s case also ordered that Toni C.'s home be assessed. Toni C., however, lived with her mother, who had an extensive criminal record and a dependency history in which she had failed to reunify with her children. Moreover, a confidential informant told DCFS that the maternal grandmother reported she had no family in California, and that, contrary to Mother's assertion, Toni C. and her mother were not part of Mother's family. In fact, the maternal grandmother believed Toni C. and her mother were prostituting Mother's sisters. The maternal grandmother was homeless and had a history of mental

health problems, and DCFS was unable to verify her report, but the information was sufficient to raise concerns about the children's safety if Toni C. and her mother had access to them.

### 6. Housing

In July 2022, Mother told DCFS she was living with family but, as of November 2022, she had not provided her address. DCFS explained to Mother that to move toward unmonitored and overnight visits, DCFS would need to know where Mother lived, confirm she lived at the location, and perform a home assessment. Mother reported she sometimes stayed with the maternal grandmother and sometimes stayed with other family or friends. Mother requested the maternal grandmother's home be assessed for placement but she never provided the maternal grandmother's address. She did not give DCFS names or addresses for her other family and friends.

Although Mother denied being in a relationship with Father or having any contact with him, both parents provided the same address to the court, indicating that they shared a post office box, and they shared additional addresses on file.

In October 2022, DCFS referred Mother to a housing program and gave her information about affordable housing and a housing voucher lottery. Mother confirmed to DCFS on October 28, 2022, that she had been contacted by the program and had scheduled an intake appointment; the social worker helped Mother gather the necessary paperwork. Mother reported on November 16, 2022, that she was scheduled to meet with her case manager on November 21, 2022, about a possible housing unit.

### 7. Contact with DCFS

Mother failed to appear for visits scheduled with DCFS on July 15, 2022, August 4, 2022, September 9, 2022, October 7,

2022, and November 3, 2022. On October 26, 2022, Mother failed to appear for the child and family team meeting she had requested.

8. Additional Information

Mother claimed to be working part-time but did not submit proof of employment.

Mother was invited to participate in Ellie G.'s medical appointments and Regional Center meeting, but Mother did not make herself available.

B. *Father*

Father attended two sessions of his domestic violence program in July 2022 and never returned. The parenting course instructor reported Father had been removed from his caseload. Father also had been moved to a waitlist for co-parenting at his request. Father never provided certificates of completion for any programs.

Father did not visit Ellie G. and did not respond to the letters DCFS sent each month asking him to contact the social worker to set up a visitation schedule. DCFS continued to attempt to locate Father but was unable to contact him directly.

On November 10, 2022, the court terminated both Mother and Father's reunification services with Gracie G. and ordered permanent placement services.

VIII. *Termination of Reunification Services*

Mother appeared for the section 366.21, subdivision (e) review hearing on December 13, 2022; Father did not. Mother requested additional reunification services. She noted she had completed her substance abuse, parenting, and domestic violence classes, and had attended 10 sessions of therapy, with a report

from the therapist that she seemed motivated to change and was addressing the issues that led to DCFS intervention.  Mother was now working part-time, she had enrolled in a program for housing assistance, and she had applied for an apartment. Mother's counsel acknowledged her visits had not been liberalized and she had never provided her address but pointed out that Mother had provided an address for purported cousin Toni C., whom counsel described as Mother's "godmother's daughter."

Mother's counsel characterized DCFS's "biggest issue" with Mother as her housing, which Mother was in the process of addressing.  Mother argued she should not be denied further reunification services because she lacked housing and contended there was a substantial possibility Ellie G. would be returned to her in the next six months.

Father's counsel requested additional reunification services because Father "did take steps to enroll in some of these programs."

Counsel for Ellie G. recommended termination of reunification services for both parents.  He argued that although Mother had participated in services, the question was whether she had benefitted from her case plan.  Counsel argued the evidence showed Mother had not made substantive progress: "Mother has been dishonest with DCFS about her living situation, which has not been verified.  She reported living with a family member and denied living with her mother.  Mother's response to DCFS is troubling.  She provided DCFS with two family members to be assessed, but the Department was informed by a confidential informant that they are not actually family members.  Mother also represented that she was living

24

with maternal grandmother, but maternal grandmother is homeless. The Department has not been []able to verify who Mother has been living with for months. And given that the Department has not been able to make contact with Father, I would infer the parents are still living together. [¶] Furthermore, regarding visits, it looks like Mother has been inconsistent from July through November. Towards the end of the [F]all, she has one a week, on average. There appears to be attempts made by both the Department and the caregivers to make up these visits. In some instances, Mother would reschedule visits but then cancel the visits. [¶] In light of Mother's unaddressed case issues and now her inconsistent visits," Ellie G.'s counsel recommended terminating reunification services.

The court said that for the reasons articulated by Ellie G.'s counsel, "Mother's inconsistent visits, Mother not really benefiting from her case plan or not being honest with the Department about where she lives—these are very important for the child to be able to live in a stable and safe home. The child is only one year old. So, at this point, I'm going to terminate [family reunification]." The court found by clear and convincing evidence that Mother and Father had failed to participate in and make substantive progress in their court-ordered treatment plan, and there was no substantial probability Ellie G. would be returned to them in the next six months. The court terminated the parents' reunification services for Ellie G. and set a permanency planning hearing date.

Mother filed a petition for extraordinary writ challenging the termination of reunification services and setting of the permanency planning hearing date. This court issued an order to

25

show cause why the requested relief should not be granted.  At Mother's request, we stayed the order setting the permanency planning hearing while the order to show cause was pending.

## DISCUSSION

I.    *Applicable Law and Standard of Review*

When the juvenile court removes a dependent child from parental custody, absent a specific statutory exception, it is required to order the child protective services agency (here DCFS) to provide the parent with services to facilitate the reunification of the family.  (§ 361.5, subd. (a); see *Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 843 (*Tonya M.*); *In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [reunification services are among the "[s]ignificant safeguards" that are built into the dependency statutory scheme]; *In re M.F.* (2019) 32 Cal.App.5th 1, 13 ["[f]amily reunification services play a critical role in dependency proceedings"], disapproved on other grounds in *Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 631, fn. 8.)

For a child under three years old on the date of initial removal, as Ellie G. was, this period of reunification is presumptively limited to six months.  (§ 361.5, subd. (a)(1)(B); *Tonya M.*, *supra*, 42 Cal.4th at p. 843.)  At the six-month review hearing, if "the court finds by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan, the court may schedule a [permanency planning] hearing."  (§ 366.21, subd. (e)(3).)  Reunification services may be extended at the six-month review hearing if "the court finds there is a substantial probability that the child . . . may be returned to their parent or

26

legal guardian within six months or that reasonable services have not been provided." (*Ibid*.)

We review an order terminating reunification services to determine if it is supported by substantial evidence. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688.) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.)

II.  ***Analysis***

A.  *Substantive Progress*

Mother contends (1) no substantial evidence supported the court's finding she failed to make substantive progress on her court-ordered treatment plan, and (2) there was substantial evidence Ellie G. could be returned to her custody by the 12-month mark. We disagree.

The record as a whole contains substantial evidence from which the court could have found it highly probable that Mother had not made substantive process despite her participation in court-ordered services. The record shows Mother behaved evasively, misleadingly, and manipulatively from the start. She concealed and lied about her pregnancy and went "on the run"

27

with newborn Ellie G.  She refused to respond to diligent efforts by DCFS to contact her, frustrated DCFS's investigation at every turn, lied to and misled DCFS and social service agencies, and refused to disclose basic information necessary to ascertain whether she was participating in her court-ordered programs and whether she was taking steps to address the various problems that led to the dependency.  Mother refused to sign documents so that Ellie G. could receive services, promised but rarely provided information to DCFS, and did not disclose to her service providers why she was in need of services.

Mother submitted documentation indicating she completed three court-ordered programs, and, as she notes, her progress letters included some general positive comments about her participation in services.  But the lack of change in Mother's behavior over the course of the reunification period demonstrated her lack of substantive progress.  The record contains abundant evidence that even at the end of the reunification services period Mother continued to lie, conceal, and mislead.  She tried to arrange for her visits to be monitored by a person she misrepresented to DCFS as a relative.  She attempted to misdirect DCFS by asking for a home assessment of a relative who was homeless.  She concealed the address or addresses where she was staying.  She regularly refused to provide information sought by DCFS to allow them to assess her progress, her prospects for reunifying, and any potential for liberalized visitation.  Mother even skipped the child and family team meeting in October 2022 that she had requested.

Additionally, Mother frequently failed to visit Ellie G., missing or canceling more than 20 visits between July and November 2022.  "Visitation is an essential component of a

reunification plan.  [Citation.]  To promote reunification, visitation must be as frequent as possible, consistent with the well-being of the child." (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426.)  Mother blamed her inconsistency in visitation on her job, but she declined DCFS's offer to change her visitation schedule to better suit her schedule.  Missing visits on this scale appear to have hampered Mother's connection with her child:  Ellie G. cried when picked up for visits with Mother and wanted to be held by Y.L. when she returned from visits.

Mother contends the court unfairly discredited her substantial progress in her services.  She argues her service providers all commented positively on her progress and recognition of the issues that led to juvenile court jurisdiction.  To support her argument, Mother relies on Garcia's July 2022 description that she was "engaged, friendly, cooperative, motivated, takes accountability and is open to discussing case issues during sessions."  But just the month before, in June 2022, after months of working with Mother, Garcia did not even know why Mother had an open dependency case.  Then, when Zhu took over from Garcia in September 2022, Mother again withheld information about the dependency matter.

Mother next cites the topics she was described as "working on" in her three completed programs as evidence of her progress.  But working on boundaries, self-esteem, emotional intelligence, mindfulness, maintaining sobriety, and increasing positivity does not establish she made any progress on those subjects.  Similarly, Mother notes that Zhu said she demonstrated an understanding of the materials in parenting class.  However, comprehending the materials does not equate to insight or progress on the issues that led to the dependency.

Finally, Mother relies on Zhu's November 4, 2022 statement that Mother "has begun addressing underlying issues that have contributed to DCFS intervention and appears to be motivated for change." Zhu made that statement in a letter dated November 4, 2022, but she did so without crucial information. On November 17, 2022, Zhu asked DCFS for an update on Mother's case and conveyed Mother's dissatisfaction that the children were not being returned to her despite her completion of programs. The social worker advised Zhu of DCFS's concerns, who in turn advised DCFS that Mother "had not reported a lot of the information provided by" the social worker. Zhu then told DCFS she understood its concerns. Not only does Mother's choice to give incomplete information to DCFS call into question the extent to which Mother was addressing the issues that led to jurisdiction or was motivated to change, but also it undermines Zhu's November 4, 2022 statement because Zhu lacked a full understanding of what Mother needed to address in order to reunify with her child.

Mother next claims her part-time job, her housing referral, and the fact that she was addressing boundaries and self-esteem as topics in her domestic violence program demonstrate she was beginning to establish her independence from Father. Mother does not identify, nor did we locate in the record, anything to suggest a connection between Mother's employment or housing referrals and any progress with respect to domestic violence; no therapist ever stated Mother was becoming independent from Father or her employment and housing referral were in any way related to breaking away from her abusive partner. Mother relies here again on Zhu's general statement that she had begun to address case issues and appeared motivated to change, but as

noted above, Zhu made that assessment without knowledge of the full scope of the issues that led to juvenile court jurisdiction.

Mother argues the inference made by DCFS and Ellie G.'s counsel that she was living with Father was speculative and not supported by the record. But the court did not find they were living together. The court began its remarks by indicating agreement with the reasons presented by Ellie G.'s counsel, but it then identified the particular factual bases for its ruling: "For reasons articulated by [Ellie G.'s counsel], Mother's inconsistent visits, Mother not really benefiting from her case plan or not being honest with the Department about where she lives—these are very important for the child to be able to be in a stable and safe home." Whether Mother was residing with Father was not mentioned by the court; it was her consistent lack of candor about where she lived that was identified as a reason to terminate reunification services.

Mother finally argues her inconsistent visits alone were insufficient to terminate reunification services. As the court did not base its decision to terminate reunification services solely on Mother's inconsistency in visitation, this argument fails to establish error.

B.  *Substantial Probability of Return*

Mother argues further reunification services should have been ordered because there was a substantial probability Ellie G. could be returned to her within six months. (§ 366.21, subd. (e).) We disagree. Family reunification services for a child as young as Ellie G. are provided for six months from the dispositional hearing but no more than 12 months from the date the child entered foster care. (§ 361.5, subd. (a)(1)(B).) A child is deemed to have entered foster care on the earlier of the date of the

31

jurisdictional hearing or the date that is 60 days after the date on which the child was initially removed from parental custody. (§ 361.49.) Here, Ellie G. was removed from her parents' custody on December 8, 2021. Sixty days from her initial removal was February 8, 2022.[2] Therefore, at the December 13, 2022 hearing the court could only have authorized reunification services through February 8, 2023, (§ 361.5, subd. (a)(1)(B)), and it could only consider the possibility of reunification within that timeframe. (*Tonya M.*, *supra*, 42 Cal.4th at p. 846.)

Mother's argument that Ellie G. could have been returned to her custody in less than two months is premised on the reductive view that the "primary concern" impeding reunification was Mother's "living situation." She contends two months would have allowed her to obtain housing and to demonstrate regular visitation, so there was a substantial probability of reunification with Ellie G. during that time. This argument fails to address Mother's ongoing evasiveness and lack of candor, the absence of meaningful progress to resolve the issues that led to the dependency, and the fact that she had rejected offers to modify the visitation schedule so she could visit Ellie G. more regularly, all of which indicate the unlikeliness of reunification with Ellie G. in less than two months. On the record as a whole, we conclude the court did not err when it found by clear and convincing evidence there was no substantial possibility Ellie G. could be returned to Mother's custody by February 8, 2023. Mother has not established any error in the termination of

---

[2]     The jurisdictional hearing took place March 22, 2022, so the operative date is the date of Ellie G.'s removal.

32

reunification services and setting of a permanency planning hearing.

## DISPOSITION

The petition for extraordinary writ is denied. The stay of the permanency planning hearing is lifted. In the interest of justice, this decision shall become final as to this court five days from the date it is filed. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, P. J.

We concur:

GRIMES, J.

WILEY, J.